COOLIDGE (GORDON v.). See Case No. 5,606.

## Case No. 3,185.

### COOLIDGE v. GUTHRIE.

[1 Flip. 97; 8 Am. Law Reg. (N. S.) 22; 3 Am. Law Rev. 582.][1]

Circuit Court, S. D. Ohio. Nov. 21, 1868.

JURISDICTION—SEIZURE OF PROPERTY AN ACT OF WAR—HOW AND WHEN—RIGHTS OF CLAIMANT.

1. During the late civil war, where an United States officer in command of troops, while in an insurgent state, seized property belonging to a citizen of that state, and sold it to a third person, and the latter was sued after the war by the owner at the time of the seizure: *Held*, that the court had no jurisdiction over the subject matter.

[Cited in Mitchell v. U. S., 21 Wall. (88 U. S.) 352; Dow v. Johnson, 100 U. S. 169; U. S. v. Smith, Case No. 16,335.]

2. The validity of such seizure could not be tried in a municipal court in a common law proceeding, as such seizure was an act of war, and no action can be maintained in such court against the captor of booty.

3. Under the general issue in trover this defense was admissible.

4. After the cotton seized had been in the firm possession of the captor twenty-four hours, it became booty by the laws of war, and the title to the same was wholly lost to the former and hostile owner. If the plaintiff had any right which can be recognized, it is against the government, and must be asserted elsewhere.

[2] [At law. This was an action of trover brought to recover the value of cotton mentioned in the plaintiff's declaration. The defendant pleaded the general issue. The parties submitted the cause to the court, waiving the intervention of a jury.

[According to the statute regulating the practice in such cases, "the finding of the court upon the facts—which finding may be either general or special—shall have the same effect as the finding of a jury." "When the finding is special, the review" (by the supreme court of the United States) "may extend to the sufficiency of the facts to support the judgment." Act March 3, 1865, c. 86, § 4 (13 Stat. 501). As this case was important in the principles which it involved, it was deemed proper to find the facts specially.

[The facts were accordingly found upon the evidence as follows:

[1. On the 12th of July, 1862, General Samuel R. Curtis, commanding an army of the United States, took military possession of the town of Helena, in the state of Arkansas. That state was then in rebellion against the United States.

[2. The cotton was all raised upon farms belonging to General Gideon J. Pillow, who was, at the time of the seizure of the cotton, in the military service of the rebel government. The farms were in the immediate vicinity of Helena.

[3. General Curtis ordered the cotton in controversy to be seized and brought into Helena; and it was seized and brought there accordingly. The wagons conveying it were protected by troops detailed for that purpose.

[4. He sold and delivered the cotton to the defendant and one William W. Babcock, jointly. There were two sales—one 200 bales, and one of 36 bales. Both sales were made at Helena, on the 26th of July, 1862. The agreed price was 14½ cents per pound. The average weight of the bales was 400 pounds.

---

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 3 Am. Law Rev. 582, contains only a partial report.]

[2] [From 8 Am. Law Reg. (N. S.) 22.]

[5. Subsequently the defendant Guthrie delivered 82 bales of the cotton to Alfred Spink, at Memphis, pursuant to the order of a quartermaster of the army. Spink paid Guthrie $45 per bale delivered. Fourteen bales more of the cotton were taken by a gunboat, to be used, as was alleged, for caulking purposes. The residue, consisting of 140 bales, was shipped by the defendant to the city of New York, and there sold.

[6. General Curtis alleged at the time of the seizure and sale of the cotton that his object was to apply the proceeds to the support of the starving negro population in the neighborhood of his camp. A small part of the proceeds were so applied. He received full payment for the cotton at the contract price. He never reported the seizure and sale to the authorities at Washington, nor to any other public officer, and died without having accounted for the proceeds to any one.[3]

[7. When the defendants bought the cotton, it had been for several days at Helena, in the military possession of General Curtis, It was in a damaged condition. The navigation of the Mississippi was at that time attended with peril to life and property. Babcock was killed at a landing twenty miles below Memphis, by guerrillas, on the 20th of October, 1862. The value of the cotton at the time and place of purchase was 14½ cents per pound,—what the defendant and Babcock paid for it. The whole quantity of the cotton purchased and received by the defendant and Babcock was 94,400 pounds. The legal title and ownership of the cotton at the time of its seizure by General Curtis was in the plaintiff, Coolidge. He was a resident of Arkansas, but was in no wise engaged in the Rebellion. All the facts relating to the cotton were known to the defendant and Babcock when they purchased.][4]

George H. Pendleton and Thomas M. Key, for plaintiff.

Sage & Hinkle, for defendant.

SWAYNE, Circuit Justice. The plaintiff is entitled to recover, unless the grounds of defense relied upon by the defendant shall be found sufficient to protect him. If liable, the measure of his liability is the value of the entire amount of the cotton which he received, at 14½ cents per pound, with interest from the 20th day of July, 1862, the time of the alleged conversion. If he was then guilty of an illegal and wrongful act touching the cotton, his liability was fixed at that time, and the subsequent delivery to another of 82 bales upon the order of the quartermaster, and the taking of 14 bales by the gun-boat, can have no retroactive operation, or in anywise affect the amount for which he must respond. Where property is tortiously taken, every one who receives it and exercises acts of ownership over it is guilty of a conversion, and is liable for its full value, without reference to the liability of others through whose hands it may also have passed, either before or after the conversion by the defendant. Williams v. Merle, 11 Wend. 81.

In the eyes of the law the order of the quartermaster, and the act of the gun-boat, are immaterial facts in the case, and may be laid out of view.

Two defenses are relied upon by the defendant, Guthrie: 1st—That this court has no jurisdiction of the case. 2d—That as soon as General Curtis acquired a firm possession of the property by having it conveyed infra praesidia, the title of the plaintiff became ipso facto extinguished, and a complete title vested in the United States; and that if the plaintiff has any rights left in respect to the cotton, they must be asserted against the United States, and that he has none which can be enforced against the defendant.

When the transaction occurred the Rebellion had risen to the proportions of a civil war, and was fully flagrant. Arkansas was enemy's territory, and all the property there was enemy's property. Cotton was an article of foreign and domestic commerce. It was one of the main sinews of the power of the insurgents. They relied upon it for the purchase of arms and other munitions of war, and chiefly to supply them with financial means for the prosecution of the strife. Important belligerent rights were conceded to them by the government of the nation. Their soldiers, when captured, were treated as prisoners of war—they were exchanged, and not held for treason. Their vessels, when captured, were dealt with by our prize courts. Their ports were blockaded, and the blockade proclaimed to neutral powers, and property found on board such vessels, belonging to persons residing in the rebel states, was uniformly held to be confiscable as enemy's property. All these things were done as if the war had been a public one with a foreign power. The Prize Cases, 2 Black [67 U. S.] 687; Mrs. Alexander's Cotton, 2 Wall. [69 U. S.] 417; Mauran v. Insurance Co., 6 Wall. [73 U. S.] 1.

No act of congress had then been passed which affects the case. No regulations issued by any department of the government prior to that time, relating to the subject, have been brought to our attention. The acts of August 6, 1861 [12 Stat. 319], and of July 17, 1862 [12 Stat. 589], have no application. Gen-

[3][The court doubtless found the facts as they were shown by the evidence or admitted by the counsel for the defendant, but the court says, "No act of congress had then been passed" regulating such seizures, and we are advised from another source that General Curtis satisfied the government that all the moneys which he so received were expended in the public service. —Eds. Am. Law Reg.]

[4] [From 8 Am. Law Reg. (N. S.) 22.]

eral Curtis and his army are to be regarded, for the purposes of this case, as if prosecuting hostilities in a foreign country with which the United State were at war, and the case is to be decided upon the principles of law applicable in that condition of things. 1st—In respect to the defense first mentioned, the inquiry arises whether it should not have been presented by a special plea, and whether it can be considered under the general issue.

The question is the same whether a seizure jure belli be made upon land or water. The case of Le Caux v. Eden, 2 Doug. 594, was of the latter class. The vessel had been restored and the captors condemned in costs and damages by a decree of the prize court. It was held, upon the fullest consideration, that the defense was admissible under the general issue. The grounds of the judgment were, that the capture of the vessel and the imprisonment of the crew were not trespasses by the common law; that, if wrong had been committed, they were triable only by the law of nations, and that no municipal court had authority to adjudge upon the subject. Such was the unanimous judgment of the court. If there were no trespasses by the common law there, a multo fortiori, there was by the common law here no conversion.

In Lindo v. Rodney, 2 Doug. 613 [note], the point of pleading was not raised, but the same doctrine of the want of jurisdiction in the courts of common law was affirmed by Lord Mansfield in a learned and elaborate judgment. In Elphinstone v. Bedreechund, the seizure was by military force on land. A judgment had been rendered by the supreme court of Bombay, from which an appeal was taken. Lord Tenterden, delivering the opinion of the privy council, said: "We think the character of the transaction was that of a hostile seizure made, if not flagrante, yet nondum cessante bello, regard being had both to the time, the place, and the person, and consequently that the municipal court had no jurisdiction to adjudge upon the subject; but that if anything was done amiss, recourse could only be had to the government for redress. We shall, therefore, recommend it to his majesty to reverse the judgment." 1 Knapp, 316.

It should also be observed that according to English law, which in this respect is in accordance with the principles of general law and public jurisprudence, no action can be maintained in a court of municipal law against the captor of booty or prize. If an English naval commander seize property as belonging to the enemy, which turns out clearly to be British property, he forfeits his prize in the court of admiralty, and that court awards the return of it to the party from whom it was taken; but the case of Le Caux v. Eden decided the question that no British subject can maintain an action against the captor. * * * In like manner, property taken under color of military authority falls under the same rule. If property be taken by an officer under the supposition that it is the property of an enemy, whether of a state or of an individual, which ought to be confiscated, no municipal court can judge of the propriety or impropriety of the seizure. It can be judged only by the authority delegated by the crown. 3 Phil. Int. Law, p. 192, § 130.

See, also, Alexander v. Duke of Wellington, 2 Russ. & M. 54; The Army of the Deccan, 2 Knapp, 106; Nicol v. Goodall, 10 Ves. 156; Hill v. Reardon, 2 Sim. & S. 431; Duckworth v. Tucker, 2 Taunt. 7; 1 Chit. Gen. Pr. 2, 18, notes; Porte v. U. S., Dev. Ct. Cl. 171. These authorities are decisive upon the subject. If the action would not lie against General Curtis, obviously it will not against his vendee. The principal fact, and the incident which followed, are governed by the same rule. The case of The Admiralty, 13 Coke, 53; Anon., Cro. Eliz. 685; King v. Broom, Carth. 398; Turner v. Neele, 1 Lev. 243; Ridly v. Egglesfield, 2 Lev. 25. It was competent for congress to give the jurisdiction, but it has not seen proper to do so. Const. U. S. art. 1, § 8. We hold this objection to the plaintiff's right to recover well taken. This conclusion does not conflict with the ruling of the supreme court in Mitchell v. Harmony, 13 How. [54 U. S.] 115. There the property in question belonged to a citizen, and not to an enemy.

2d—It remains to consider the second proposition relied upon by the defendant. Chancellor Kent says: "In a land war, movable property, after it has been in the complete possession of the enemy twenty-four hours (and which goes by the name of booty, and not prize), becomes absolutely his without any right of postliminy in favor of the original owner; and much more ought this species of property to be protected from the rule of postliminy when it has not only passed into the complete possession of the enemy, but been bona fide transferred to a neutral." 1 Kent, Comm. (Last Ed.) 120. "The title to property lawfully taken in war may, upon general principles, be considered as immediately divested from the original owner, and transferred to the captor." * * "As to personal property, or movables, the title is in general considered as lost to the former proprietors as soon as the enemy has acquired a firm possession, which, as a general rule, is considered as taking place after the lapse of twenty-four hours, or after the booty has been carried to a place of safety infra praesidia of the captor." Law. Wheat. 629. "If the hostile power has an interest in the property, which is available to him for purposes of war, that fact makes it prima facie a subject for capture. The enemy has such an interest in all convertible and mercantile property within his control, or belonging to persons who are living under his control,

whether it be on land or at sea, for it is a subject of taxation, contribution, and confiscation." Dana, Wheat. § 256, N. 171.

Vattel says: "We have a right to deprive our enemy of his possessions of every kind which may augment his power and enable him to make war." "Whenever we have an opportunity we seize on the enemy's property and convert it to our own use; and thus, besides diminishing the enemy's power, we augment our own, and obtain at least a partial indemnification or equivalent, either for what constitutes the subject of the war, or for the expenses and losses incurred in its prosecution. In a word, we do ourselves justice." * * * "As the towns and lands taken from the enemy are called conquests, all movable property taken from him comes under the denomination of booty. This booty naturally belongs to the sovereign prosecuting the war, no less than the conquests, for he alone has such claims against the hostile nation as warrant him to seize on such property and convert it to his own use. His soldiers, and even his auxiliaries, are only instruments which he employs in asserting his right. He maintains and pays them. Whatever they do is in his name and for him." Vat. Law Nat. pp. 364, 365, bk. 3, c. 9.

It is usual to allow those making the capture to appropriate more or less of the property to their own use; but the paramount right and title are, nevertheless, in the sovereign, who may assert them whenever it is deemed proper. Congress, in passing the act of March 3, 1863 [12 Stat. 820], in relation to "captured and abandoned property," proceeded upon this ground. The doctrines thus laid down are in accordance with those of all approved publicists. (See the authorities cited by the authors from whom we have quoted.) There can be no doubt that the facts as found bring this case within the authorities. The commanding general caused the cotton to be seized and brought within his lines. He had a firm possession of it there for more than the requisite time. There is no question as to the right of postliminy. The possession by both the general and the purchaser was unchallenged by the enemy. The purchaser conveyed the property to New York, and there sold it. Under the law arising upon these facts there can be but one result. We hold the second objection fatal, also, to the right of the plaintiff to recover in this action. If he has any right which can be recognized, it is against the government, and must be asserted elsewhere.

Judgment must be for the defendant, with costs.